UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __03/29/17___
```

-------------------------------------------------------X
                        :

In re:                        :

                        :

SAMUEL STEINBERG,      :

                        :

               Debtor.    :

                        :

-------------------------------------------------------X

                        :          16 Civ. 4074 (LGS)

DAVID JAROSLAWICZ, et al.,  :

                        :        **OPINION AND ORDER**

             Appellants,  :

                        :

         -against-       :

                        :

SAMUEL STEINBERG,      :

             Appellee.  :

                        :

-------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      This bankruptcy cross-appeal arises from an adversary proceeding brought by investors in a failed Romanian real estate venture that the Debtor managed. Appellants David Jaroslawicz, David Walker, Howard Freund, Neil Herskowitz, Phil Lifschitz and Abraham Elias (collectively, "Appellants") appeal the Bankruptcy Court's Order and Opinion ("Opinion") issued after a trial overruling their objections to the dischargeability of debts that Appellee Samuel Steinberg allegedly owes them. Steinberg cross-appeals the dismissal of his counterclaim seeking judgment against Jaroslawicz for indemnification for legal fees Steinberg incurred in connection with the adversary proceeding. For the reasons set forth below, the judgment of the Bankruptcy Court is affirmed in part, vacated in part and remanded for further proceedings.

I.    **BACKGROUND**

A.    **The Romanian Real Estate Venture**

Steinberg and Jaroslawicz were friends who knew each other since the 1990s and had previously invested in businesses together.  In 2005, Steinberg proposed to Jaroslawicz a plan to buy and sell Romanian real estate.  Steinberg told Jaroslawicz that he had recently sold his apartment and had funds available to invest.  Steinberg testified that, although he sold the apartment for $6.5 million, he had only $2.5 million remaining after paying loans and other encumbrances.

The two traveled to Romania in early 2006 to see potential properties to acquire.  During the trip, Steinberg and Jaroslawicz visited a Romanian bank.  While there, Steinberg showed a bank employee a financial statement from the business of Steinberg's father-in-law, Israel Taub, a successful real estate investor.  Steinberg attests that he brought the financial statement merely to show that he came from a wealthy family.

Steinberg and Jaroslawicz verbally agreed to invest in Romanian real estate.  The two initially decided that they would be "fifty-fifty partners" and split equally any profit from the sale of any real estate.  Jaroslawicz also contends the two agreed that each would "put up fifty percent of the money."  Steinberg denied that they agreed to contribute an equal amount.  Steinberg and Jaroslawicz never entered into a written agreement that memorialized the terms of their venture, which also lacked a budget, minimum capital requirement and designated term.  As Steinberg testified, they "took each deal as it came."

Steinberg "was the man on the ground" in Romania where he hired accountants, bookkeepers and Romanian lawyers to assist with the transactions.  In 2006, he formed three limited liability companies under Romanian law, referred to as the Romusa LLCs.  Steinberg and

Jaroslawicz co-owned the Romusa LLCs.  According to Steinberg, the venture's real estate transactions were conducted through the Romusa LLCs.

Throughout the venture, Jaroslawicz solicited investments from other parties.  These investors provided funds to Jaroslawicz who sent the money to Steinberg.  Jaroslawicz did not enter into a written agreement with the outside investors.  Some of these "side deals" may have altered Steinberg and Jaroslawicz's agreement to split the profits equally.

For instance, Appellant Lifschitz testified that in 2006 or 2007 he gave $100,000 to Jaroslawicz to invest in the Romanian real estate venture.  When asked to describe the terms of his investment, Lifschitz testified:  "it was my understanding that for every dollar put in, they [i.e., Jaroslawicz and Steinberg] make half, I make half.  That's it."  Lifschitz did not know in what property, if any, his money was invested.  Appellant Herskowitz testified that he gave Jaroslawicz $100,000 "for the purpose of investing in Romania."  Herskowitz testified that he thought his money was invested "in Brasov" but also said that "[he] could be wrong" and that he was unaware that there were four separate transactions conducted in Brasov County.  Steinberg acknowledges that, in total, Jaroslawicz contributed -- either directly or through investors or lenders -- $16,642,887 to the venture.

The extent of these outside investors' involvement is disputed.  Steinberg testified that he "never spoke" with any of them and that Jaroslawicz "never disclosed" their identities.  By contrast, both Lifschitz and Herskowitz testified that they discussed the terms of their investments with both Jaroslawicz and Steinberg.

In 2007, Steinberg told Jaroslawicz that he planned to place mortgages on their properties in order to obtain loans from a Romanian bank for their venture.  Over the next four years, the two executed documents that encumbered the Romanian properties with mortgages.  Steinberg

agreed to pay the interest on the mortgages, which Steinberg or his family did for the next two or three years.

According to Appellants, one individual, Manouchehr Malekan, provided approximately $690,000 for the acquisition of a property in Romania referred to as the Cluj property.  Appellants contend that one-half of the $690,000 was a loan and one-half was an investment.  In 2008, a potential buyer of the Cluj property defaulted and Steinberg collected the defaulted buyer's deposit.  While Appellants alleged in their pretrial submissions that the deposit was $1.5 million, the parties at trial did not dispute that the deposit was actually €1.5 million.  Part of the deposit was used to pay an entity called Spring Farm, a hard money lender from whom Jaroslawicz had borrowed $1.785 million at a high interest rate, and part was used to pay the principal portion of the mortgages on some of the venture's real estate.  Appellants dispute whether any of the deposit proceeds were used to repay the loan portion of Malekan's contribution.

Jaroslawicz executed four powers of attorney running to Steinberg in connection with the Romanian properties.  As pertinent here, Jaroslawicz and Steinberg executed a power of attorney in May 2008 for the three Romusa LLCs.  It authorizes Steinberg "to approve in [Jaroslawicz's] name and on [his] behalf the following:" (1) the "purchase or sale of [the] Companies' [i.e., the Romusa LLCs'] assets, including real estate[];" (2) "setting up mortgages or other type of liens over the Companies' assets, including real estate;" and (3) "any other matter related to the proper administration of the Companies."  The May 2008 power of attorney also includes the following:

> Whereas the empowered person is acting in my name, on my behalf and for my benefit, I hereby ratify and agree to ratify whatever my attorney will do or have to do in the limits of the law and of the present power of attorney.  I hereby guaranty that my attorney will be exonerated of any liability for any losses and damages that may occur, arising from or in connection with fulfilling the present power of attorney.

In June 2013, Steinberg commenced Romanian insolvency proceedings for each Romusa LLC.  Steinberg testified that he turned over the accounting files for the Romusa LLCs to a judicial administrator when he filed for insolvency and did not retain any copy of these files.

### B.    Procedural History

In March 2014, Appellants filed an involuntary petition for relief against Steinberg under Chapter 7 of the U.S. Bankruptcy Code.  *See* 11 U.S.C. § 303(b).  In December 2014, Appellants initiated an adversary proceeding, objecting to the dischargeability of debts they alleged Steinberg owed to Jaroslawicz, Herskowitz and Lifschitz.[1]  As pertinent here, they objected pursuant to 11 U.S.C. § 523(a)'s discharge exemption for (1) debts obtained by "false pretenses, a false representation, or actual fraud," § 523(a)(2)(A), and (2) debts acquired through  "embezzlement," § 523(a)(4).[2]  In addition, Appellants -- including Appellants Walker and Elias who, unlike the other Appellants, were judgment creditors of Steinberg -- objected to Steinberg's general discharge on the grounds that he failed to preserve records under 11 U.S.C. § 727(a)(3).  In January 2015, Steinberg asserted a counterclaim for indemnification against Jaroslawicz based on the May 2008 power of attorney.

---

[1] Because Jaroslawicz, Herskowitz and Lifschitz do not hold established claims against Steinberg, Appellants also sought to prove through the adversary proceeding that the amounts they invested constitute debts Steinberg owed them.  The Bankruptcy Court based its dismissal of the Complaint on other grounds, which alone are challenged on appeal.  Consequently, whether Appellants Jaroslawicz, Herskowitz and Lifschitz had valid claims is not at issue here.  Likewise, Appellants asserted during the proceedings below that Freund had invested in the venture and the amount he invested constituted a debt Steinberg owed him.  Appellants do not challenge the Bankruptcy Court's dismissal of Freund's claim to the extent it is based on his alleged investment.  Thus this claim is not at issue on appeal.

[2] The Complaint also asserts claims for nondischargeability under 11 U.S.C. § 523(a)(6), 11 U.S.C. § 727(a)(2)(A) and 11 U.S.C. § 727(a)(4)(A).  Because Appellants do not challenge the Bankruptcy Court's dismissal of these claims, they are not at issue on appeal.

The Bankruptcy Court held a four-day trial in December 2015.  Five witnesses testified: Steinberg, Steinberg's wife, Jaroslawicz, Herskowitz and Lifschitz.  In March 2016, the Bankruptcy Court issued its 45-page Opinion, which contained findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  The Bankruptcy Court held that Appellants had failed to carry their burden to show the exemptions to discharge applied and dismissed Appellant's Complaint with prejudice.  It also held that Steinberg was not entitled to indemnification and dismissed his counterclaim with prejudice.  Both parties timely appealed.

## II.    STANDARD

When reviewing a bankruptcy court's decision, the district court reviews factual findings for clear error and legal conclusions de novo.  *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012).  "A factual finding is not clearly erroneous unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *In re CBI Holding Co.*, 529 F.3d 432, 449 (2d Cir. 2008) (internal quotation marks omitted).  "[I]f the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety," a reviewing court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016) (internal quotation marks omitted).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015) (internal quotation marks omitted).

III.   **DISCUSSION**

A.   **False Pretenses, a False Representation or Actual Fraud – 11 U.S.C.
§ 523(a)(2)(A)**

Appellants assert that Steinberg obtained money from Jaroslawicz, Lifschitz and

Herskowitz for the real estate venture through false pretenses, a false representation and/or actual

fraud within the meaning of 11 U.S.C. § 523(a)(2)(A)'s exemption from discharge.  Their claim is

based on two purported falsehoods:  (1) Steinberg's alleged statements concerning his access to

family wealth and the extent of his personal wealth and (2) his agreeing to pay the interest on the

Romanian mortgages when he allegedly had no intent to do so.  The Bankruptcy Court dismissed

this claim, finding that Appellants had failed to prove that Steinberg acted with an intent to

deceive.  For the reasons below, the Bankruptcy Court is affirmed because Appellants do not

show that this factual finding was clearly erroneous.

Section 523(a)(2)(A) provides in part that "a discharge under [Chapters 7, 11, 12 or 13] of

this title does not discharge an individual debtor from any debt . . . for money . . . to the extent

obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement

respecting the debtor's or an insider's financial condition."[3]  This provision "is a tailored remedy

for behavior connected to specific debts."  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1589

---

[3] The Bankruptcy Court did not find -- and Steinberg does not argue -- that any representation by
Steinberg regarding his personal wealth or access to family wealth was "a statement respecting
the debtor's . . . financial condition" and, therefore, inactionable under § 523(a)(2)(A).  This
Court therefore assumes, without deciding, that Steinberg's alleged statements do not respect his
financial condition.  Indeed, the scope of this exception to § 523(a)(2)(A) is unsettled within this
Circuit.  *See In re Bogdanovich*, 292 F.3d 104, 112–13 (2d Cir. 2002) (noting that courts "are
sharply split" whether to construe the proviso broadly or narrowly and declining to "take[] a
position" on the issue); *In re Knight*, 538 B.R. 191, 206 (Bankr. D. Conn. 2015) (observing that
the law in the Second Circuit remains unsettled).

(2016).  The creditor objecting to discharge bears the burden of proof by a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

To be actionable under § 523(a)(2)(A), the debtor must act with scienter, regardless of whether the creditor alleges that the debtor's conduct constituted false pretense, a false representation or actual fraud.  Actual fraud requires "wrongful intent."  *Husky Int'l Elecs.*, 136 S. Ct. at 1586.  "'Actual' fraud stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that 'may exist without the imputation of bad faith or immorality.'"  *Id.* (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1878)).  Similarly, courts have consistently held that to constitute false pretenses or a false representation, a defendant must ordinarily have acted with an "inten[t] to deceive the creditor."  *Fellows, Read & Assocs., Inc. v. Rieder*, 194 B.R. 734, 737 (S.D.N.Y. 1996) (internal quotation marks omitted), *aff'd*, 116 F.3d 465 (2d Cir. 1997); *see, e.g.*, *In re Fenti*, No. 94-5025, 1994 WL 16167976, at *2 (2d Cir. Oct. 4, 1994) (unpublished) (holding that a false representation must be "made with intent to deceive"); *In re Arfa*, No. 14 Civ. 7895, 2015 WL 5610864, at *2 (S.D.N.Y. Sept. 23, 2015) (same); *In re Hartley*, 479 B.R. 635, 642 (S.D.N.Y. 2012) ("[F]alse pretense involves an implied misrepresentation or conduct intended to create and foster a false impression." (internal quotation marks omitted)).  "Reckless representations may in some cases be sufficient to except the debt from discharge."  4 Collier on Bankruptcy ¶ 523.08[1][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015); *see, e.g.*, *In re Gonzalez*, 241 B.R. 67, 74 (S.D.N.Y. 1999).  However, "mere negligence" and "poor business judgment" are insufficient to satisfy "[t]he discharge exception under Section 523."  *Sarasota CCM, Inc. v. Kuncman*, 466 B.R. 590, 594 (E.D.N.Y. 2012) (quoting *In re Gonzalez*, 241 B.R. at 71).

Whether the debtor acted with the intent to deceive is a question of fact reviewed for clear error.  *See In re Bonnanzio*, 91 F.3d 296, 301 (2d Cir. 1996) (addressing "intent to deceive" under

§ 523(a)(2)(B)); *In re Hartley*, 479 B.R. at 642.  "[A] finding of intent to deceive may be inferred from certain evidence, but is not compelled whenever a creditor presents circumstantial evidence of such an intent; [w]hether to infer the requisite intent is left to the bankruptcy court that presides over the case."  *In re Furio*, 77 F.3d 622, 625 (2d Cir. 1996) (internal quotation marks omitted); *see also McCann v. Coughlin*, 698 F.2d 112, 124 (2d Cir. 1983) ("We are particularly reluctant to find a district court finding clearly erroneous where that finding concerns motive or intent.").

### 1.   Alleged Access to Family and Personal Wealth

Appellants argue that Steinberg intentionally misrepresented the extent that Taub, Steinberg's wealthy father-in-law, would invest in the venture so as to induce Jaroslawicz to contribute funds.  This contention is based solely on an incident in 2006 when Jaroslawicz observed Steinberg show a financial statement from Taub's business to an employee at a Romanian bank.

The Bankruptcy Court found that Steinberg did not intend to deceive Jaroslawicz when he presented the statement.  This finding was not clearly erroneous.  While Jaroslawicz testified that Steinberg told the bank employee he was "consider[ing] investing [his] family money in Romania," Steinberg denied making any such statement.  The Bankruptcy Court, as the trier of fact, was entitled to resolve the conflicting trial testimony in favor of Steinberg, as it did.  *See Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008) ("In reviewing findings for clear error, we are not allowed to second-guess either the trial court's credibility assessments or its choice between permissible competing inferences." (internal quotation marks omitted)).  As Steinberg explained, he never used the bank statement "for committing [Taub's] funds" and instead showed it only to demonstrate to the bank that he came from a "wealthy family."  Steinberg also testified that Taub instructed him not to use the bank statement "for anything but puffery."  Jaroslawicz,

according to Steinberg, "never raised Taub or [the use of] family money in 2006, 2007, and 2008. He created this story as a new narrative in 2009 . . . ."

The only other evidence Appellants cite to support Steinberg's fraudulent intent is an email from March 2009.  In the email, Jaroslawicz wrote to Steinberg, "You and I both know that if you had not flashed around the $120 million statement to me and the banks, and told me you had money from the apartment you sold, I never would have advanced the money for you." Steinberg replied, "I did not show you the 'bank statements' you mention . . . .  [I]t was used only to help get us the loans from the bank[,] which you were happy for me to do . . . so don't you 'misrepresent' this fact."

This email does not render the Bankruptcy Court's finding clearly erroneous in light of the record viewed in its entirety.  The meaning of Steinberg's statement that he used the Taub documentation "to help get [them] the loans" is ambiguous:  as Steinberg testified, he "wasn't looking for a loan at that point," and the Romusa LLCs did not obtain their first mortgage until "a year-and-a-half" after the bank meeting.  Steinberg explained at trial that his statement in the email "was an exaggeration, actually.  I was ranting and raving against Jaroslawicz for saying I should come up with money from those big bank statements . . . .  I said the only reason I showed it to the bank was to be in good standing . . . .  I used [the bank statements] to help increase my image with the bank."  Steinberg, as the Bankruptcy Court found, intended to improve his image with the bank in order to establish a banking relationship.  This relationship could, and arguably did, help Jaroslawicz and Steinberg obtain future loans.  Contrary to Appellants' assertions, the Bankruptcy Court did not clearly err in finding that Steinberg lacked the intent to mislead Jaroslawicz regarding Taub's involvement in the venture.

Appellants also assert that Steinberg falsely represented the amount of money he would invest in the venture from the sale of his apartment.  They claim that Steinberg told Jaroslawicz that he had sold his apartment for $6.5 million and would invest that amount -- or "several million additional dollars" -- when in reality Steinberg netted only $2.5 million after repaying loans and other encumbrances.  Steinberg testified that he invested in the venture approximately $2 million of the proceeds from the sale of the apartment.

The Bankruptcy Court did not clearly err in finding that Steinberg had no intent to deceive Jaroslawicz about the amount of money he would invest from the sale of the apartment. The only evidence Appellants cite is Jaroslawicz's testimony that Steinberg told him "he [had] sold his apartment for six-and-a-half million dollars."  Steinberg denied ever telling Jaroslawicz that he had "six million dollars available . . . to invest" and testified that the $6.5 million represented the "total proceeds."  Jaroslawicz's own testimony is the only evidence that Steinberg said he would invest a specific amount of money from the sale of his apartment or any other source.  The Bankruptcy Court's credibility determination, favoring Steinberg over Jaroslawicz, was not clearly erroneous and will not be second-guessed.  *See Amalfitano*, 533 F.3d at 123.

### 2.  The Promise to Pay for Romanian Mortgages

Appellants also argue that Steinberg falsely represented to Jaroslawicz that he would pay the interest on the Romanian mortgages when he had no intention of doing so.  The Bankruptcy Court rejected Appellants' argument and found that Steinberg made this statement without fraudulent intent.  This finding was not clearly erroneous, particularly in light of the evidence that Steinberg paid, or arranged for his family to pay, the interest on the Romanian mortgages for two or three years.  The Bankruptcy Court also cited evidence that, although Steinberg did not have

any source of income at the time, he was able to borrow money from other sources, primarily Taub.

### B.      Embezzlement – 11 U.S.C. § 523(a)(4)

Appellants argue that Steinberg embezzled $300,000 from the real estate venture, which constitutes a debt that is exempted from discharge under 11 U.S.C. § 523(a)(4).  Specifically, they assert that Steinberg collected a €1.5 million deposit forfeited by a defaulting potential buyer of the Cluj property and that Steinberg embezzled $300,000 of that deposit as it "remains completely unaccounted for."  The Bankruptcy Court dismissed this claim, finding that Appellants failed to show that Steinberg intentionally misappropriated funds.  As explained below, the Bankruptcy Court's dismissal is affirmed.

Section 523(a)(4) excepts from discharge "any debt . . . for . . . embezzlement."  Under § 523(a)(4), "embezzlement requires a showing of wrongful intent."  *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1760 (2013) (addressing state of mind requirements for § 523(a)(4)).  To prove embezzlement, a creditor must show "that (1) the debtor rightfully possessed another's property; (2) the debtor appropriated the property for use other than the use for which the property was entrusted; and (3) the circumstances implied a fraudulent intent." *In re Boyard,* 538 B.R. 645, 654 (Bankr. E.D.N.Y. 2015) (internal quotation marks omitted); *accord In re Bucci*, 493 F.3d 635, 644 (6th Cir. 2007).  As with § 523's other discharge exemptions, the creditor bears the burden of proof by a preponderance of the evidence.  *See Grogan*, 498 U.S. at 286–87.

Steinberg testified that one of the Romusa LLCs received €1.5 million, which a potential buyer had forfeited when he defaulted; that €500,000 of this amount was used to pay a portion of the principal on the Cluj property mortgage; and that the remaining €1 million, "upon the direction of Mr. Jaroslawicz, went to a company, one of his third party . . . lenders named Spring

Farm Finance," thus accounting for all of the €1.5 million.  Steinberg's testimony is supported by a spreadsheet introduced at trial.  The Bankruptcy Court credited this evidence and rejected Jaroslawicz's contrary statements and argument in finding that these disbursements were proper and did not constitute misuse or embezzlement.

Appellants contend that they proved embezzlement based on a discrepancy in the accounting records regarding how Steinberg allocated the funds from the deposit.  The payment to Spring Farm, according to Appellants, was in dollars, not euros.  Therefore, as they argued to the Bankruptcy Court, if €500,000 from the deposit was used to pay interest on the Romanian mortgages, and $1 million (or €746,269) was paid to Spring Farm, that leaves "253,731 euros unaccounted for from the 1.5-million-euro deposit."  On appeal, Appellants argue that "the only logical conclusion" is that Steinberg is responsible for the disappearance of those funds, which Appellants claim equal $300,000 based on the exchange rate they use.

Appellants' contention regarding the "unaccounted for" funds is unavailing for two reasons.  First, the Bankruptcy Court was entitled to credit Steinberg's testimony that the payment to Spring Farm was in euros rather than in dollars, and therefore no funds were missing.  *See UFCW Local One Pension Fund*, 791 F.3d at 372 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (internal quotation marks omitted)).

Second, even if the additional $300,000 was not paid to Spring Farm, the fact that funds are unaccounted for does not compel a finding that Steinberg embezzled them.[4]  "For purposes of

---

[4] The Bankruptcy Court was also entitled to find in the alternative, as it did, that any accounting discrepancy could be explained by a return of capital of $345,330 to the investor Malekan.  This finding was not clearly erroneous.  Appellants' pretrial submission asserts that Steinberg repaid Malekan the $345,000 loan.  One of their proposed findings of fact ties the Malekan repayment to

section 523(a)(4) it is improper to automatically assume embezzlement has occurred merely

because property is missing . . . ."  *4* Collier on Bankruptcy ¶ 523.10[2].  Appellants had the

burden of proof but failed to offer any evidence that Steinberg knowingly misused the allegedly

missing $300,000.  Because the Bankruptcy Court's "account of the evidence is plausible in light

of the record viewed in its entirety," its finding that Steinberg did not intend to misuse the

venture's funds is affirmed.  *In re Motors Liquidation*, 829 F.3d at 158 (internal quotation marks

omitted).[5]

> ### C.      Failure to Preserve Records – 11 U.S.C. § 727(a)(3)

Appellants argue that all of Steinberg's debts should be exempted from discharge under 11

U.S.C. § 727(a)(3) based on his allegedly deficient recordkeeping.  The Bankruptcy Court

dismissed this claim, holding that Steinberg provided documentation that was sufficient to enable

Appellants to ascertain Steinberg's financial condition.  As explained below, the Bankruptcy

Court's judgment of dismissal on this claim is vacated and remanded for further proceedings.

Section 727(a)(3) states:

> The court shall grant the debtor a discharge, unless . . . the debtor has concealed,
> destroyed, mutilated, falsified, or failed to keep or preserve any recorded
> information, including books, documents, records, and papers, from which the

---

the proceeds of the forfeited deposit:  "when the buyer for th[e Cluj] property defaulted and
[Steinberg] collected $1,500,000, [Steinberg] only returned the half of the funding which was a
loan to the investor [who had contributed approximately $690,000, i.e., Malekan]."  Although
Appellants now cite evidence that the Malekan repayment preceded Steinberg's receipt of the
forfeited funds, the Bankruptcy Court did not clearly err in resolving against Appellants
ambiguities in the record that Appellants created.

[5] Appellants also argue for the first time in their reply brief on appeal that because Steinberg
assumed responsibility for making interest payments on the mortgages, it was improper for him to
allocate €500,000 to make these payments.  "But 'issues raised for the first time in a reply brief
are generally deemed waived.'"  *In re Motors Liquidation Co.*, 538 B.R. 656, 665 n.4 (S.D.N.Y.
2015) (quoting *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010)).
Regardless, Appellants' argument lacks merit, as the Bankruptcy Court found that the money was
used to pay principal, not interest, and Appellants make no argument as to why this finding was
clearly erroneous.

> debtor's financial condition or business transactions might be ascertained, unless
> such act or failure to act was justified under all of the circumstances of the case[.]

"While § 523 simply bars discharge of specific debts incurred through fraud, § 727 is a blanket prohibition of a debtor's discharge, thereby protecting the debts owed to all creditors." *In re Chalasani*, 92 F.3d 1300, 1309 (2d Cir. 1996). As such, § 727 "impos[es] an extreme penalty for wrongdoing, which must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *In re Kran*, 760 F.3d 206, 210 (2d Cir. 2014) (internal quotation marks omitted).

"To implement this record-keeping requirement, § 727(a)(3) provides a two-step approach." *In re Cacioli*, 463 F.3d 229, 235 (2d Cir. 2006). "The initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained." *Id.*; *accord In re Kran*, 760 F.3d at 210. At this step, the creditor must show that the debtor "failed to keep records such that his financial condition or business transactions could not be ascertained during the pendency of the [bankruptcy] proceeding or for a reasonable time before." *In re Kran*, 760 F.3d at 210. "If the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified" -- i.e., step two. *In re Cacioli*, 463 F.3d at 235.

The Bankruptcy Court dismissed Appellants' claim at step one; it held that Appellants had not shown that Steinberg's documentation was "insufficient to accurately access his financial condition." The court noted that Steinberg had provided eight years of joint tax returns, domestic banking statements with his wife, credit card statements and "bank account statements from Marfin Bank of Romania on the accounts of each of [the Romusa LLCs]." The court rejected Appellants' contention that the records were inadequate in light of "missing" documents related to

the real estate venture, including the accounting files for the Romusa LLCs that Steinberg had turned over to a Romanian judicial administrator.  The Bankruptcy Court found that Appellants had not shown how these documents relate to Steinberg's financial condition.

The Bankruptcy Court's analysis, which assessed only whether Steinberg's financial condition could be ascertained from the documentation, is incomplete.  "Under section 727(a)(3), it is not sufficient that merely the debtor's financial condition be ascertainable from the debtor's books or records; they must also disclose material 'business transactions.'"  6 Collier on Bankruptcy ¶ 727.03[3][f].  "Although [Section] 727(a)(3) focuses on records relating to the debtor's personal financial affairs, his failure to keep adequate financial records regarding the business transactions of a closely held corporation that are necessary to determine his personal financial affairs may result in the denial of a discharge."  *In re Gormally*, 550 B.R. 27, 49 (Bankr. S.D.N.Y. 2016) (quoting *In re White*, No. 12-11847, 2015 WL 9274771, at *3 (Bankr. S.D.N.Y. Dec. 18, 2015)); *see Office of the Comptroller Gen. of Republic of Bol. ex rel. Gen. Command of the Bolivian Air Force v. Tractman*, 107 B.R. 24, 27 (S.D.N.Y. 1989) ("[S]ection 727(a)(3)'s complete disclosure requirement extends beyond the property of the estate to include all 'business transactions' which shed light on the financial condition of the debtor.").  The Bankruptcy Court did not address whether Steinberg had maintained adequate records as to business transactions for a reasonable period of time before the bankruptcy proceeding was commenced.  The Bankruptcy Court should address this issue in the first instance, resolving any factual disputes.[6]  *See Klein v.*

---

[6] Only if the Bankruptcy Court finds on remand that Appellants have satisfied their burden to show that Steinberg failed to keep sufficient records does it need to address whether this failure was justified under the circumstances -- i.e., step two of § 727(a)(3).  *In re Cacioli*, 463 F.3d at 235.  "[W]hether a debtor's failure to keep books is justified is a question in each instance of reasonableness in the particular circumstances."  *Id.* (internal quotation marks omitted).  This Court expresses no opinion on this issue.

*Morris Plan Indus. Bank of N.Y.*, 132 F.2d 809, 811 (2d Cir. 1942) (noting that the provision that

discharge may be denied if debtor has failed to keep records from which his financial condition

and business transactions might be ascertained "intends an extensive discretion in the trier of

facts").

### D.   Indemnification Counterclaim

Steinberg asserts a counterclaim seeking indemnification for his attorney's fees in this

adversary proceeding from Jaroslawicz based on the May 2008 power of attorney or common law

agency principles.  The Bankruptcy Court dismissed the claim, holding that the power of attorney

did not expressly provide for such indemnification.  The court did not address whether common

law agency principles provide for indemnification.  As explained below, the Bankruptcy Court's

dismissal of the counterclaim is affirmed in part, vacated in part and remanded for further

proceedings.

### 1.   May 2008 Power of Attorney

Under New York law,[7] "[a] party's right to indemnification may arise from a contract or

may be implied based upon the law's notion of what is fair and proper as between the parties."

*McCarthy v. Turner Const., Inc.*, 953 N.E.2d 794, 798 (N.Y. 2011) (internal quotation marks

omitted).  "[A] contract assuming [an] obligation [to indemnify] must be strictly construed to

avoid reading into it a duty which the parties did not intend to be assumed."  *Hooper Assocs., Ltd.*

*v. AGS Computs., Inc.*, 548 N.E.2d 903, 905 (1989).  Under New York law, it is well settled that:

> [i[nasmuch as a promise by one party to a contract to indemnify the other for
> attorney's fees incurred in litigation between them is contrary to the well-
> understood rule that parties are responsible for their own attorney's fees, the court

---

[7] This Court applies New York law because the parties do.  *See, e.g.*, *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) ("The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.").

should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise.

*Id.*

*Hooper* imposes an "exacting standard." *Gotham Partners, L.P. v. High River Ltd. P'ship*, 906 N.Y.S.2d 205, 207 (1st Dep't 2010). "[W]here suits involving third parties are conceivable, a provision containing only broad language of indemnity (i.e., a clause that promises indemnification of 'all claims, damages, liabilities, costs and expenses, including reasonable counsel fees') will generally not support a claim for indemnity for fees incurred litigating inter-party claims." *Thor 725 8th Ave. LLC v. Goonetilleke*, No. 14 Civ. 4968, 2015 WL 8784211, at *4 (S.D.N.Y. Dec. 15, 2015) (citing *Hooper Assocs.*, 548 N.E.2d at 905).

The clause at issue does not speak with the unmistakable clarity that *Hooper* requires, but instead states broadly that Jaroslawicz will "guaranty" that Steinberg "will be exonerated of any liability for any losses and damages that may occur, arising from or in connection with fulfilling the present power of attorney." The provision does not reference attorneys' fees, and Steinberg presented no evidence suggesting that Jaroslawicz intended to indemnify Steinberg for fees arising from inter-party litigation. *See Thor 725 8th Ave. LLC*, 2015 WL 8784211, at *4. For instance, no evidence suggests that Jaroslawicz and Steinberg thought suits by third parties were inconceivable when he executed the May 2008 power of attorney. *See, e.g.*, *Breed, Abbott & Morgan v. Hulko*, 541 N.E.2d 402, 403 (N.Y. 1989) (holding escrow agent must be indemnified for expenses incurred in litigation with party to escrow agreement given that it was "difficult, if not impossible" to conceive of potential third-party actions).

Steinberg argues that *Hooper*'s rule of construction does not apply because the adversary proceeding is not "strictly" inter-party litigation:  three Appellants did not sign the power of attorney -- i.e., Herskowitz, Lifschitz and Freund, who invested in the venture (collectively, the

"third-party investors").[8]  Steinberg argues that Jaroslawicz must indemnify him for the legal fees Steinberg incurred "in defense of the claims made by the third-party investors."  *See, e.g.*, *Di Perna v. Am. Broad. Cos., Inc.*, 612 N.Y.S.2d 564, 567 n.3 (1st Dep't 1994) (holding that *Hooper* did not foreclose claim based on an indemnification clause that did "not provide specifically for the indemnification of counsel fees" because the party sought "counsel fees incurred in defending an action by a third party").

Steinberg fails to show that the mere presence of the third-party investors is sufficient to render *Hooper* inapplicable.  Where, as here, the lawsuit involves a claim by a contracting party and non-contracting parties, courts have held that "legal expenses could not be recovered where the party to an indemnity agreement expends fees to litigate against overlapping claims and defenses by a contracting party joined with a non-contracting party."  *In re Refco Sec. Litig.*, 890 F. Supp. 2d 332, 355 (S.D.N.Y. 2012) (applying New York law); *see Tecnoclima, S.p.A. v. PJC Grp. of N.Y., Inc.*, No. 89 Civ. 4337, 1995 WL 390255, at *3 (S.D.N.Y. June 30, 1995); *see also Goshawk Dedicated Ltd. v. Bank of N.Y.*, No. 06 Civ. 13758, 2010 WL 1029547, at *8 (S.D.N.Y. Mar. 15, 2010) (rejecting the defendant's argument that the underlying litigation was a "third-party claim for the purpose of evaluating [the defendant's] request for indemnification," even though the plaintiff did not sign the indemnification contract).  In other words, "[i]f the presence of the third-party makes no practical difference in the expenditure of attorney['s] fees, then the suit should be treated as one solely between the contracting parties and so subject to [*Hooper*'s] rule of unmistakable clarity."  *In re Refco Sec. Litig.*, 890 F. Supp. 2d at 355.  Notably, Steinberg has not cited any legal authority for a contrary position.

---

[8] Steinberg concedes that he "does not seek indemnification for the litigation generated by the judgment creditors, Walker or Elias, neither of whom were identified as investors in the Adversary Proceeding."

The third-party investors' claims, allegations and evidence overlap with those asserted by the contracting party, Jaroslawicz. The third-party investors and Jaroslawicz assert the same causes of action in the Complaint. Most important, the factual allegations and proof overlap: both the third-party investors and Jaroslawicz alleged in the Complaint and asserted at trial that they were fraudulently induced to invest based on Steinberg's purported misrepresentations regarding his access to family or personal wealth and his promise to pay interest on the Romanian mortgages. As Steinberg contends, the claims of Herskowitz, Lipschitz and Freund were "all premised on the central lie originated by Jaroslawicz."

The conclusion that *Hooper* applies is reinforced by the timing of power of attorney, which was executed in May 2008. Nothing in it suggests that it applies retroactively. Thus Jaroslawicz's duty to indemnify, if any, covers Steinberg's conduct only from May 2008 onwards. The third-party investors contributed funds in 2006 or 2007. Although the proof regarding their initial involvement may be unique to them, it concerns conduct that pre-dates Jaroslawicz's duty. Steinberg has failed to show how, from May 2008 onwards, the claims and factual allegations of the third-party investors differ such that their inclusion in the litigation "resulted in the expenditure of additional fees." *In re Refco Sec. Litig.*, 890 F. Supp. 2d at 356.

### 2. Common law indemnity

Steinberg argues in the alternative that common law principles of agency law compel Jaroslawicz to indemnify him for legal fees in defense of claims brought by the third-party investors. Although Steinberg advanced this argument to the Bankruptcy Court, its Opinion does

not address it.  This issue is remanded for resolution by the Bankruptcy Court as it turns on a fact-bound inquiry.

"[I]t is hornbook law that 'a principal has a duty to indemnify the agent against expenses and other losses incurred by the agent in defending against actions brought by third parties if the agent acted with actual authority in taking the action challenged by the third party's suit.'" *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2667 (2013) (quoting Restatement (Third) of Agency § 8.14 cmt. d (2006)); *accord Meadowbrook-Richman, Inc. v. Associated Fin. Corp.*, 253 F. Supp. 2d 666, 677 (S.D.N.Y. 2003) (applying New York law).  If "the circumstances raise the possibility of a principal-agent relationship but no written authority of the agent has been proven, questions of agency and of its nature and scope . . . are questions of fact."  *Bostany v. Trump Org. LLC*, 901 N.Y.S.2d 207, 207–08 (1st Dep't 2010) (internal quotation marks omitted); *see also DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 286 (S.D.N.Y. 2014) ("[T]he question whether an agency relationship exists is highly factual . . . and can turn on a number of factors . . . ." (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006)).

Steinberg presupposes a crucial fact -- that Lifschitz, Herskowitz and Freund are third parties to a principal-agent relationship between Jaroslawicz and Steinberg.  The Bankruptcy Court made no such explicit finding, and the facts and circumstances of the underlying relationships are controverted.  Whereas Steinberg testified that Jaroslawicz essentially concealed the identity of the third-party investors, Herskowitz and Lifschitz testified that they had discussed their investments with both Jaroslawicz and Steinberg.  A trier of fact could conclude that Lifschitz, Herskowitz and Freund are not strangers to the venture; rather, they are investors suing Steinberg to the extent he was acting as their agent.  An agent is not entitled to indemnification based on a lawsuit brought by a principal.  *See* Restatement (Second) of Agency § 438 cmt. k

(1958) ("In actions between principal and agent, the agent is not entitled to indemnity for expenditures made in obtaining judgment against the principal, but is entitled only to normal court costs."); *Cory Bros. & Co. v. United States*, 51 F.2d 1010, 1013 (2d Cir. 1931) ("A principal's obligation to reimburse his agent for expenses of litigation arising out of the agency should not be extended to include the defense of a suit brought by the principal himself for nonperformance or misperformance by the agent of his duties.").  The dismissal of Steinberg's counterclaim is vacated and remanded to allow the Bankruptcy Court to make findings regarding the scope of the principal-agency relationship between Jaroslawicz and Steinberg, and the third-party investors and Steinberg, and to address in the first instance Steinberg's argument under common law agency principles.

## IV.   CONCLUSION

For the foregoing reasons, the judgment of the Bankruptcy Court is AFFIRMED in part, VACATED in part and REMANDED for further proceedings.

The Clerk of Court is respectfully directed to close the case.

Dated:  March 29, 2017
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE